## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:14CR85(JAM) |
| v. | |
| CARLOS "JOEL" COLON | August 25, 2015 |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The government respectfully submits this memorandum in aid of sentencing for the sentencing hearing of the defendant Carlos "Joel" Colon, scheduled for August 31, 2015. For the reasons detailed below, the Government seeks a sentence of 97 months in prison followed by a five year term of supervised release.

### INTRODUCTION

Joel Colon wanted to rob a drug dealer at gun-point, and he actively sought an opportunity to put that idea into action. Being a drug-dealer himself, he knew that fellow dealers would not report such a crime to the police. When presented with a victim, he did not hesitate – he jumped on it. Joel Colon solicited, organized, and encouraged his fellow co-defendants to commit a violent, armed home invasion of a stash house. He was ready, willing and able to take whatever steps were necessary to complete this crime, even if it meant people being shot and even killed. This case did not start with the government – as his family would like to believe. It started with Joel Colon. The defendant's actions show him to be a dangerous man who has lived a criminal life for some time with virtually no consequence. The community deserves to be protected from those who sell large quantities of cocaine to our neighbors; it deserves to be protected from the acts of violence perpetrated by those in the drug trade. In short, it deserves to be protected from Joel Colon.

-1-

## PROCEDURAL BACKGROUND

On April 11, 2014, the defendant was arrested pursuant to a criminal complaint, and on April 23, 2014, a Grand Jury indicted the defendant for (1) conspiracy to distribute and to possess with intent to distribute five kilograms of more of cocaine, (2) conspiracy to commit a Hobbs Act robbery, (3) conspiracy to use a firearm in furtherance of a crime of violence; (4) use of a firearm in furtherance of a crime of violence; (5) conspiracy to distribute and to possess with intent to distribute cocaine; and (6) possession with intent to distribute and distribute of cocaine.

On March 4, 2015, the defendant pled guilty to Counts One and Four of the indictment, charging him with conspiracy to commit a Hobbs Act robbery and use of a firearm in furtherance thereof. The parties and Probation agree that the defendant faces a mandatory minimum sentence of sixty months in prison. (*See* Pre-Sentence Report ("PSR") at ¶¶4 & 106-108.) The parties and Probation also agree that the defendant is a criminal history category two and that his adjusted offense level is 20, which results in a Guideline range of 97 to 106 months in prison, followed by two to five years of supervised release. (*Id.*)

## FACTUAL BACKGROUND[1]

### A.    *The Investigation's Initiation*

On March 24, 2014, the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") initiated a sting operation involving defendants Joel and Camby Colon ("the Colon brothers"). On that date, ATF agents met with a confidential informant ("CI-1"), who was working with the Bridgeport Police Department and the Federal Bureau of Investigation ("FBI"), and CI-1's handler, a former FBI Task Force Officer.  During that meeting, CI-1 explained and his handler confirmed that the Colon brothers had been distributing cocaine from the Ponce Auto Care

---

[1] The facts relayed herein are taken from the PSR.  (*See* PSR at  ¶¶6-50, 52-54 & 75-104.)

Center ("Ponce"), an auto-detailing business where Camby Colon and Joel Colon worked.  CI-1 told the agents that, over the last eighteen months, he had purchased cocaine from Joel Colon, and that CI-1 believed that Camby Colon was actually "in charge." CI-1 explained that he regularly purchased fifty to one hundred grams of cocaine from Joel Colon, and that in July 2013, Joel Colon had offered to front CI-1 half a kilogram of cocaine.

CI-1 further informed ATF agents that, approximately three months before the meeting (around December 2013), Joel Colon had approached CI-1and asked, in substance, if CI-1 knew any narcotics dealers who could be set up for a robbery.  Joel Colon told CI-1 that if CI-1 owed money to or had problems with any other narcotics dealers, he (Joel Colon) would arrange for someone to rob the dealer. CI-1 had provided this information to the FBI in December 2013, contemporaneously with the conversation with the defendant.

Following this conversation, ATF agents queried their own records for any information about the Colon brothers.  Through that query, agents located an ATF report stating that, in 2011, ATF and the Drug Enforcement Administration ("DEA") used another confidential informant to purchase an Iver Johnson, model M1, 9mm rifle with a cut-off stock from, *inter alia*, the Colon brothers.   DEA's Bridgeport office had been investigating Camby Colon for narcotics trafficking. During the course of that investigation, Camby Colon had offered to sell firearms to the DEA confidential informant ("DEA CI-1"). Based on this information, DEA and ATF provided funds to DEA CI-1, who on August 17, 2011, met with the Colon brothers and for $1,100 purchased the rifle. The price of the gun also included the sale of a chip to convert the firearm to fully automatic mode. That chip was to be provided to DEA CI-1 in the future. During the sale, Camby Colon made reference to a "lookout" whom he identified as "Gringo."

According to DEA CI-1, Gringo demonstrated how to operate the rifle during the sale.  As detailed *supra*, defendant Hiram Mojica introduced himself in this case to government agents as Gringo.  The report further indicated that, in the meetings leading up to the sale, Camby Colon also provided DEA CI-1 with a sample of cocaine.

In addition to the information provided by CI-1 and as part of DEA's historic investigation, DEA had engaged in controlled purchases of cocaine had been made from the Colon brothers and their organization. For example, in 2011, DEA CI-1 engaged in two controlled purchases of cocaine from Camby Colon: (1) on June 6, 2011, DEA CI-1 purchased one ounce of cocaine; and (2) on August 12, 2011, DEA CI-1 purchased one hundred grams of cocaine and "Gringo" participated in the sale.  During the course of the second sale, DEA CI-1 told investigators that he had seen what appeared to be a kilogram of cocaine in Camby Colon's home.

Similarly, in September 2013, DEA introduced a second confidential informant ("DEA CI-2") to Camby Colon. During the course of their interactions, Camby Colon stated that "he collects money from people in the area and then provides them with kilograms of cocaine." Camby Colon told DEA CI-2 that "a kilogram of cocaine costs about $36,000 to $37,000 in the area" and that "he recently lost two kilos of cocaine and now he picks them up locally." In October 2013, Camby Colon told DEA CI-2 that "he currently had two kilograms of cocaine [but that] he and his cousin would be able to purchase five kilograms from [DEA CI-2]."  Camby Colon explained that this was because "he recently lost several kilograms of cocaine and was not moving as much cocaine as he had in the past." Camby Colon further stated that "he had no

problem turning over one, two or three kilograms at a time." Ultimately, no transaction between Camby Colon and DEA CI-2 occurred.

### B. The Controlled Purchase

In an effort to corroborate the information provided to them, ATF agents set up a controlled purchase of cocaine from Joel Colon, which occurred on March 27, 2014.  On that day, CI-1 and an ATF confidential informant ("CI-2") went to Ponce where they met with Joel Colon.  During the meeting, CI-1 stated that CI-2 wished to buy "an onion" – or an ounce of narcotics. Joel Colon replied, "We just got it.  We not even cookin'."  From this, the agents understood that the Colon brothers had just received the cocaine and had not yet had the time to "cook" it into crack, or cocaine base.

Joel Colon further stated that he "had a hundred ready," indicating to a package of cocaine before him, and which the CIs took to mean 100 grams of cocaine. CI-1 explained to Joel Colon that CI-2 originally planned to purchase 100 grams, but that CI-2 wanted to check the quality of the cocaine first.    CI-2 then counted out $1,100 in ATF provided funds and provided it to Joel Colon, who in return gave CI-2 a bag containing a substance that was later determined to be approximately one ounce of cocaine.    Shortly after the purchase, CI-1 received a call from Camby Colon, during which CI-1 told him that Joel Colon had just given CI-1 an ounce of cocaine. Camby Colon replied, "a'right."

### C. An Attempted Controlled Purchase

On April 1, 2014, the CIs attempted to arrange a second purchase of cocaine from the Colon brothers at Ponce.  During their meeting, Camby Colon advised the CIs, "We are supposed to get it today." Joel Colon added, "They haven't called us yet. We just waiting for that

call.  Once we, like, get that call, then we good."   Joel Colon then provided CI-2 with his
telephone number and asked CI-2, "What you guys want?" to which CI-2 replied, "Another zip"
– meaning another ounce of cocaine. When CI-2 told Joel Colon that he needed to talk to him
about a way that they could make money, Joel Colon stated, "we can all make money like
that….if you guys want, if you guys get together and you say you want one of the full or two,
call me because we can make a phone call and make the guy come here."

> **D.      CI-2's Attempted Purchase and Introduction of the Robbery**

On April 3, 2014, CI-2 attempted another controlled purchase of narcotics from Joel
Colon at Ponce.  During their meeting, Joel Colon stated, "I'm waiting for my boy.  He's
supposed to be here in a little bit."  Joel Colon then asked CI-2, "What is it?  Same thing?"  CI-2
responded, "I was gonna get two of them.  Two ounces."  Joel Colon replied, "He say he should
be here in a little bit, like twenty minutes."

CI-2 then asked Joel Colon, "Do you know anybody that, like, hit licks and shit?" A
"lick" is slang for a robbery.  After expressing confusion regarding CI-2's question, Joel Colon
called over to his brother and asked him to join the conversation. Once Camby Colon entered the
discussion, CI-2 asked, "Stick up kids, you know any of them?"  "Stick up kids" is slang for
people who commit robberies.  Camby Colon responded, "Stick up kids," and Joel Colon said,
"Ah, yeah.  Yeah, yeah, yeah," indicating his understanding of CI-2's question.  CI-2 explained
that he was asking on behalf of his "Cuban buddy" and that CI-1 had "turned me on to y'all."

Joel Colon asked CI-2 if CI-2 wanted to "Do something?" and asked, "Out here, or?"  CI-
2 explained that he did not know the details, and that the Colon brothers would have to meet with
CI-2's associate if they were interested. In response, Joel Colon said, "I can let you know, and I

would like to know, you know, I gotta know what, what's gotta do.  My boys, you know, I got couple of my people but they, they not doing that shit around."

CI-2 and Joel Colon then discussed future cocaine purchases.  Joel Colon stated that "I got my people right now... I just call them, I need one, two, three bricks ... we not playin' around."  Agents understood Joel Colon to be saying that he could obtain one to three kilograms of cocaine provided that CI-2 and CI-2's associates had the money.  Joel Colon then confirmed what CI-1 had told the FBI and ATF; he stated that he would give CI-1 "300, 400, maybe half sometimes" – meaning 300 to 500 grams of cocaine – on credit.  Joel Colon explained that he and CI-1 "got the trust."

CI-2 then asked Joel Colon to let him know about "what we be talking about" – referring to the potential robbery.  Joel Colon pressed CI-2 about whether the plan involved cash, to which CI-2 stated that he did not know all the details and that Joel Colon would have to meet his Cuban friend. Joel Colon then stated, "I got my people.  I just fuckin' talk to them and, like, they do whatever they got to do." Joel Colon explained that his people "go to work, they got their you know own jobs...whenever they got day off, they do whatever they got to do and that's it.  They keep workin'.  They not fuckin' around ...they don't play games." CI-2 stated, "I don't need no little young ass kids," to which Joel Colon responded, "When we do this shit, we do it right, yo. We do shit right.  Even though, sometime, when I got shit like that, I just call two, three of my [friends] from the islands.  They come over here, they do whatever, they go back.  Nobody know what they do, who they are.  You just gotta let me know what, what, exactly, you need to get done.  Show that they, you know, go around, show who it is, what, they do whatever they gotta

do."  CI-2 asked when he could bring his associate to meet with Joel Colon, and Joel Colon stated that he could meet "whenever you ready, like tomorrow."

### E.  The UC Introduction

On April 4, 2014, CI-2 introduced an undercover ATF agent ("the UC") to the Colon brothers at Ponce. After they exchanged greetings, the Colon brothers directed the UC and CI-2 into a small, windowless office in Ponce. There, the UC asked Joel Colon if he would rather speak in English or in Spanish, to which both Colon brothers expressed their preference to speak Spanish.  As a result, the majority of the remaining conversation was conducted in Spanish.

Joel Colon stated that CI-2 had talked to him about obtaining narcotics and asked the UC how much of the narcotics the UC wished to obtain. The UC stated that they could talk about that, but that he understood from CI-2 that the brothers were interested in "un tumbe," which literally translates to a "knock down," but is slang for a robbery. Joel Colon then confirmed that CI-2 had spoken to him about obtaining individuals to commit a robbery and continued to explain that he questioned CI-2 about the details of the robbery, such as its location, timing, and intended victim. The UC advised the Colon brothers that he would explain the details.

The UC stated, in substance, that he was a courier for a Cuban trafficking organization. The UC continued that his job was to pick up one to two kilograms of cocaine for distribution from different houses located off Interstate 95 between Stamford and Norwalk, Connecticut and then to deliver the drugs to another location.  The UC further explained the process through which he received the narcotics.  Specifically, the UC stated that, on the day of the pick-up, he is told to wait at a specific location. A member of the organization would then call the UC and provide him with an address at which to pick up the drugs and an allotted period of time in which

to arrive.  The UC has always observed two individuals in the house from which he picks up the drugs, one of whom had a firearm.  The armed individual stayed with the UC, while the second individual went into another room in the house and returned in possession of the cocaine that the UC was to transport. The UC stated that, while waiting for the cocaine, he observed an additional fifteen marked kilograms of cocaine in the living room of the house.

Joel Colon questioned the UC as to the number of kilograms of cocaine in the house.  In response, the UC confirmed that there would be fifteen kilograms. The UC stated that he was due to receive a call on Monday, April 7, 2014, and would be told the exact day of the pick-up.  The UC further stated that he does not talk on the phone and would have to meet the Colon brothers in person subsequent to receiving the information. Joel Colon then asked, "So how do we have to do it?  Do we have to go into the house at the same moment that…"  In response, the UC said, "No, no well that depends on how the people are going to do it.  They can… what we can… what we do is what once I enter the house I close the door.  Okay, then I stay there waiting and talking with the short chubby guy.  Then the other one brings me the one or the two and then I open the door and leave.   So, what I am thinking is that you have to tell me more or less when you are going to come in, so I know if have to get on the floor not that I did a 'tumbe'."

At the conclusion of this explanation, the UC asked, "How does that sound to you?" Joel Colon replied, "It sounds good." The UC advised that the stolen kilograms of cocaine would be divided in half: the Colon brothers and their associates would receive one half, and the UC and CI-2 would keep the remaining half.  Joel Colon then asked, "But that is there for sure?"  The UC responded, "that's for sure."  Joel Colon then asked the UC, "Is that every week?" meaning that the UC picked up kilograms of cocaine weekly.  The UC responded, "No, no, no.  That's

like every two weeks." Joel Colon then confirmed that the UC picked up the cocaine "whenever they call you," and the UC replied in the affirmative.

Joel Colon then questioned the UC as to the number of individuals in the house. The UC again replied that he had observed two individuals. The UC and Joel Colon discussed the fact that the houses were always different.  The UC explained that "I see the pictures that are at the house and they are other people.   What I think is that they know people, they pay them some money use the house and then they leave.  Because it's always during the day when everything is calm.  Because the houses are small but everything is calm."  Joel Colon then stated, "Okay. It can be done. I will have to call the guys and see what they tell me. Like I told you, I can get someone who no one knows, who are not from here."

During the conversation, Camby Colon questioned whether the individuals inside the house were armed, to which the UC replied that he had observed one of the individuals to be armed; however, he was not sure if the other individual was also armed.  Camby Colon further questioned if the UC had observed any other firearms inside the house.  The UC responded, "No…." Camby Colon then stated, "[b]ecause who we are going to send, if they see that a weapon is drawn they are going to clean them out quickly. They are not going to bullshit…. They are going there for their things, but if the resist too much, or they do anything they are going to" at which point the UC said "they are going to handle it" and Camby Colon responded, "Yes." Camby Colon further stated that the crew "have done things around" and "know what they are doing."  In fact, Camby Colon explained, the brothers "use them whenever they owe us money…or a big case or something like if someone fucked us up, and … was trying to screw with us, and it has to be resolved then we use those guys."  Camby Colon then confirmed that the

-10-

crew knew how to do a "tumbe".  Joel Colon explained that these associates had jobs, but would complete the robbery and then return to their normal lives.

Joel Colon questioned the UC as to how they could remain in communication. The UC replied that, once he received a call on Monday, he would travel to Ponce and meet with them. Joel Colon stated, "so they are already expecting... they already know... that in these upcoming days something is going to happen and they can count on you?"  The UC assured Joel Colon that it would happen and asked him, "Are we good?"  Joel Colon replied, "Yes."

### F.    The UC's Second Meeting with the Colon Brothers

On April 7, 2014, CI-2 and the UC met with the Colon brothers at Ponce in another windowless room.  Joel Colon asked the UC if everything was good.  The UC replied that all was good, and that he had spoken with his associates. The UC advised that the pick-up would occur on Friday, April 11, 2014, and that on Wednesday, April 9, 2014, he would be told the area where he was to wait and the time at which he would be called and informed of the stash house's address. Joel Colon questioned the UC as to how many kilograms would be present. The UC responded that he received one to two kilograms and that he had observed an additional fifteen kilograms in the house. The UC detailed, however, that they obtained the kilograms that he transported from the back of the house and not from the fifteen. As a result, he did not know if there was more cocaine in the back of the house or what else may be in the back of the house.

The UC requested to meet with the Colon brothers on Wednesday to provide them with the information he was to receive on that day. The UC also requested to meet with the crew that was going to execute the robbery. Camby Colon advised the UC that, once he received the information, Camby Colon would have the crew available.  Joel Colon stated that a member of

the crew had already expressed the need to see the UC's face in advance of the robbery to insure that the UC did not get hurt.

### G.     The UC's Third Meeting with the Colon brothers and Introduction to Defendant Mojica

On April 9, 2014, the UC and CI-2 met with the Colon brothers at Ponce – again the meeting began in a windowless room.  The UC advised the brothers that he had been contacted and told that he would be called on Friday, April 11, 2014, at 5:30 pm and given the stash house's address. The UC further advised that he was told to wait near Exit 6, south of Stamford, Connecticut for this call.  The UC questioned Joel Colon as to the whereabouts of the crew.  The Colon brothers stated that the crew was in the area, and they were ready.  The UC requested to meet the crew the following day. Both brothers agreed to this arrangement.

At this time, a male, later identified as defendant Hiram Mojica, walked into the room. The Colon brothers stated, "this is one of them," and Mojica introduced himself as "Gringo." Mojica advised the UC that he could speak to him in both English and Spanish.  The UC then began to speak in English.  The UC then explained the same narrative that he had provided to the Colon brothers, noting the following: (1) the number of kilograms in the house, (2) the kilograms were stamped and the stamp would need to be removed, (3) there would be two individuals in the house and one of them carried a firearm and (4) the cocaine would be divided half and half, with half for the Colon brothers, Mojica, and their associates, and half for the UC and CI-2.

The UC stated that he wanted to ensure that he did not get "fucked up." Joel Colon advised that they needed to say "nobody move" upon entering the house.  In response, the UC stated, "I don't care… If you tell me hit the floor… Whatever the fuck you tell me to do that's what I'm doing, You feel me … I just don't want to get fucked up this isn't my kind of shit." The

-12-

UC, Joel Colon, and Mojica then discussed not harming the UC during the robbery. Mojica questioned the UC if there were any additional individuals in the house. The UC replied that all he had observed were the two individuals.  Mojica further questioned the UC if a police station was in close proximity to the house. The UC responded, "No, no, the houses are always in chilled out places."

Joel Colon questioned the UC if he was definitely sure that the cocaine would be present. The UC replied that he was positive the cocaine would be there.  Camby Colon questioned whether the UC observed the reported amount of kilograms every time he entered the house. The UC replied in the affirmative. Joel Colon told the UC that "[a]ll this week, we have been over thinking about this to make sure this works out well."

Mojica stated that he was not afraid of cameras or the individuals in the house, but that he feared guards outside the house. Joel Colon and Mojica then asked the UC whether they should wear masks, to which the UC responded, "Bro that's your decision." Joel Colon discussed the importance of conducting the robbery in a timely manner, and that they would take whatever cocaine was in the main room.  Mojica stated he had been thinking of entering the house with a silencer and shooting one of the individuals in the thigh in order to intimidate the second individual.  Mojica advised that, if shots were fired, he would have a short window of opportunity to complete the robbery.

Joel Colon advised the UC that the UC would meet the remaining crew the following day.  At the conclusion of the meeting, Mojica mentioned other robberies of which he was aware where narcotics had been stolen without physical assaults.  In response, the UC expressed to all three men that the individuals in the house were not going to simply hand over the cocaine.

Joel Colon then said that the guards "are not stupid" and that they would choose their lives over the cocaine. Shortly thereafter, the UC ended the meeting, asking "[s]o are we all set?" to which Joel Colon responded, "Tomorrow."

### H.      The UC Meets the Remaining Crew

On April 10, 2014, the UC and CI-2 traveled to Ponce, where they made contact with Joel Colon.  After confirming that the cocaine would be present in the house, Joel Colon explained to the UC that "because I expect him to have a pistol, we will have the "Toston". I have a friend that is willing to throw himself over there…  I'm waiting for another one that is… illegal."  The UC took this to mean that Joel Colon was obtaining firearms to use to commit the robbery. Joel Colon then stated this was "serious" and that he wanted to be sure that it was not a "set-up."   The UC confirmed that it was not a set-up, and then Joel Colon stated that his associates were "down" and had stepped out but would be back.

Subsequently, Camby Colon entered the main office area and advised the UC that his associates were traveling to Ponce.  A male, who was introduced as "Omar," then entered the main office area and exchanged greetings.  The UC, CI-2, the Colon brothers, and Omar entered the windowless office. Joel Colon advised Omar that he should conduct the robbery and requested that the UC explain the circumstances surrounding the robbery to Omar.  Joel Colon suggested that the UC speak in Spanish.  The UC went through his narrative again, after which Joel Colon explained to the UC that Omar wished to conduct the robbery, but had been recently told he had to surrender himself to the court.  Joel Colon stated that he was encouraging Omar to execute the robbery prior to serving his sentence.

During the conversation, Omar twice questioned the UC as to how they should execute the robbery. The UC communicated that the logistics were up to the crew and reiterated that he was the one to close the door upon entry and open and close the door upon departure. Omar then stated that the UC would have to remain in the house during the robbery. Omar assured the UC that he would not be harmed. Omar stated they needed to be together prior to the robbery.

The men then discussed the logistics of the robbery. Omar specifically asked "[w]ho is going to go with me? Who are the other ones?" to which Camby Colon responded, "Humberto and 'Markisa' … There is Gringo. There are going to be four. But because of what you told us what happened to you, we invited one more." Camby Colon also stated that if they were a man down, he considered going inside himself, but opted not to since "[m]y face is known everywhere."

Omar then asked the UC if he had observed any rifles in the house. The UC replied that he observed one individual armed with a firearm and was not sure if the other individual was also armed. Omar questioned the UC concerning the prior houses where the UC had picked up cocaine, asking him if he ever returned to same house, to which the UC responded negatively. Joel Colon then stated, "the guy probably pays him like five hundred 'pesos' to someone at the house, like us, when we find somewhere to receive." Omar then asked the UC to describe the houses and whether they appeared to be lived in or generally vacant. The UC stated that they appeared to be occupied as someone's home.

Camby Colon exited the room. The UC advised Omar that the packaging on the kilograms needed to be removed subsequent to the robbery. Joel Colon and Omar stated that they would sell the kilograms in small amounts; Joel Colon explained, "we not gonna sell the

shit like one brick.  Nah.  That shit, we gonna take it real slow." Referring to the Colon brothers, Omar then explained that "[h]is brother and him, he do the same shit.  He sold brick and shit." Omar continued saying, "somebody's gonna get hurt man and and probably someone's gonna get dead too."  Joel Colon explained that Omar "don't want nobody to move cause somebody trying to do something, they not going to be like, 'Oh, I'm sorry' you know."  Shortly thereafter, Omar exited the room. Joel Colon stated that he kept telling Omar not to shoot anyone because "I know what they do…. They're gonna go over there, they, anything, 'pang pang!', keep going, and that's it. I just don't know. You know, that's it. That's why I want they see your face.  … You don't want to go in there and they don't know you." The UC took this to mean that the crew would begin shooting if the guards in the house were not cooperative and without the crew being able to identify the UC, he would be at risk of getting shot. Joel Colon advised that he had been thinking all week "how to do this shit." Omar returned to the room and questioned the UC if they could pose as gardeners or painters.  The UC replied that that would not work.

Later, during this same meeting, two additional men, later identified as defendants Humberto Soto and Markus Mendez, arrived at Ponce.  The UC, CI-2, the Colon brothers, Omar, Soto, and Mendez met in a garage bay area of Ponce. Soto asked the UC, "So what are we talking about here?" The UC began to explain why he was providing the information, and that he collected one to two kilograms of cocaine for distribution. Soto, however, interrupted the UC, saying "basically just get to where we gotta go…what house we gotta go to." Soto advised, "This like my brothers right here [referring to the other participants to the conversation]. I'm not trying to have nobody popped.  Somebody pull out, we shootin'." Mendez questioned the UC as to how many individuals were in the house and if guns were present.  The UC began to answer, and

Omar stated that one of the individuals was armed, and that he expected there to be additional firearms present.

The UC explained the manner in which the pick-up generally occurred and the fact that one individual was armed with a firearm. The UC further explained that a second individual would travel to a rear bedroom and return with one or two kilograms for the UC. The UC advised that he observed fifteen additional kilograms in the living room of the house.  At this point, defendant Mendez asked,"[t]hey have the work right in front?" and the UC confirmed the location of cocaine.  The UC further advised that the kilograms had stamps affixed to them that would have to be removed after the robbery.  The UC asked Soto "you feel me?" to which Soto responded, "I understand what you sayin'."  Soto then stated, "anybody pull out, they gonna get popped…I know your face, that's all I needed to know man."  The UC understood that Soto would shoot any occupant of the house that brandished a weapon.

Mendez questioned the UC regarding the location of the house, asking if it was in Norwalk.  The UC advised that he had been told to wait at Exit 6, in Stamford, Connecticut. Omar stated that they all had to be together because the UC did not know the specific location of the house.  Soto then stated,

> it's the gun situation man. Like, I need a spreader, I'll try to find a shotty 'cause trust me, no one is going to move with a pump, cause you got a handgun, they going to move on you, you got a pump, they ain't gonna want to move nowhere. We need that and a couple of handguns. I got… I could get my hands [U/I] like around two handguns….You follow me? Even if nobody got a gun on, I don't give a fuck, I'll still walk in, I got hands. So…Regardless… You know? I gots to tape those motherfuckers up, give us enough time to escape, to get the fuck out of there.

The UC understood that Soto wanted to have a pump action shotgun for the robbery because the occupants of the house would be more compliant faced with that weapon than they

would be facing a handgun.  Soto then reiterated that if the occupants of the house brandished weapons, they would be shot. He further expressly told the crew that they could not have any cell phones, watches or anything else in their pockets that might identify them and that the cell phones of the occupants of the house would have to be taken from them and any hard line connections would have to be torn from the walls.  Then Soto said, "But you know what I'm saying right? You walk in to a blood bath nigga, you never know."  He further stated, "I usually have [my associates] already in the house.  Whattup.  It's an easy in and out… I'm down… but we've gotta come up with some guns."  Soto again stated, "they pulling out, we shooting." Soto and Omar discussed obtaining firearms, and Soto and Joel Colon discussed distributing the robbed kilograms amongst the participants.  Soto stated that all of the participants must be dressed in black, not have cellular telephones, and have gloves. Soto further suggested creating fictitious tattoos in order to avoid identification.

###### I.        The Take-Down: UC's Introduction to Defendants Diaz and Pierce

On April 11, 2014, CI-2 traveled to Ponce and made contact with the Colon brothers, Mojica and Soto.  For approximately the next hour, CI-2 had various conversations with the Colon brothers and Soto, during some of which they discussed the upcoming robbery.  At one point, Joel Colon stated that one members of the crew had tied up an entire family by himself. CI-2 asked Joel Colon if they had any ratchets – referring to firearms – to which Joel Colon responded in the affirmative. Joel Colon further stated that his associate from yesterday who was going to "go in" – referring to Omar – had actually surrendered to prison and hence, Joel Colon had to locate a replacement.

During the conversation, Joel Colon additionally explained the pricing for cocaine from Puerto Rico, and that one could get cocaine for less money from the Dominican Republic. Joel Colon explained to CI-2 that last year, he and his organization got "more than a hundred over here.  We used to grab like eight, five to eight every week."  He then directed CI-2 to ask CI-1 about it.  Agents understood this to mean that the organization had received more than one hundred kilograms of cocaine in the previous year.

Shortly thereafter, Soto joined the conversation with CI-2 and Joel Colon. During that conversation, Joel Colon stated that they needed to have everything ready, including guns.  Soto stated that they needed to "tie everybody up" and get out of the house. Joel Colon further stated that the cocaine in the house should be good because it was stamped and that they were not going to sell it at one time, but rather that they would "break it up" and sell it over a period of time. Soto then explained that he would probably be the only one without a "strap" – or a gun – but that he would "just bang [people] out…I'm good; I got hands."

Later, Joel Colon told to CI-2 that they were waiting for "the guy who's got all the guns." He explained that he hoped to "put all the guns together."  Joel Colon then told CI-2 that they had been looking for a gun that they kept at Ponce, but had been unable to locate it.  CI-2 then asked if they had a gun because "we gotta have a gun," to which Joel Colon stated, "we gotta have five guns…my [friend] has a .257 magnum; we got a nine millimeter."

After waiting for approximately one hour, the Colon brothers and Mojica entered CI-2's car to travel to Stamford, Connecticut with CI-2.  The men directed CI-2 to the intersection of East Main Street and Burroughs Street in Bridgeport, Connecticut.   While waiting at this intersection, CI-2's vehicle was joined by a silver BMW sedan and at that time, Mojica exited

CI-2's car and entered the silver BMW sedan.  Joel Colon explained that the "beemer" contained the people who had the firearms for whom they had been waiting.

During this drive, Joel Colon explained to CI-2 that, since Omar was unable to show up, Joel Colon was able to get his "other boy" and "the one black guy."  Hence, they were now going to have an extra man. Joel Colon reiterated that the "black" male in the BMW, referring to Pierce, had previously committed a robbery where he tied up a "whole family" by himself. When CI-2 expressed concern that Pierce might "turn on" the UC, both brothers stated that Pierce already knew; "all of them already know."

Upon arriving in Stamford, Connecticut, Joel Colon directed CI-2 to stop at an Advance Auto Parts retail store.  There, CI-2's vehicle was joined by a blue Volvo SUV, in which was Soto and Mendez.  Joel Colon informed CI-2 that "they" wished to stop at the store to purchase "tape" or "straps."  Based on video footage and receipts from the store,  which were provided in discovery, Diaz and Soto entered the store, and Diaz purchased "Stealth Original Gloves", "No residue Duct Tape", and "Extreme Hold Duct Tape".  After the purchase, CI-2, followed by the blue Volvo SUV and the silver BMW sedan, traveled to the take-down location in Stamford, Connecticut, where the UC awaited their arrival.

At the take-down location, video captured Soto driving the SUV, in which Mendez was the front passenger and that the silver BMW was driven by Diaz, with Pierce as the front passenger and Mojica seated in the rear bench seat.  The UC greeted both the Colon brothers and CI-2.  The UC approached the blue Volvo SUV containing Soto and Mendez and spoke through the passenger-side window.  The UC observed that both Soto and Mendez were wearing black clothing.  The UC questioned when they anticipated entering the house, to which Soto answered,

-20-

"comin' in."   The UC asked how he and CI-2 were going to receive their proceeds of the robbery, to which Soto replied that they were all going to get together to divide them.   The UC further questioned if they were going to take the "fifteen keys of coke," to which Soto motioned to the Colon brothers and stated, "That's the leader right there." Camby Colon advised they would take all the cocaine. The UC asked the group if they were going to leave him in the house, to which Soto asked, "What do you want to do?  You want us to leave you in there?" and stated that they would tie the UC up.  The UC responded that he would remain in the house.

The UC walked to the vehicle containing Diaz, Pierce and Mojica. Mojica, who was wearing a grey colored shirt and black pants, then exited the vehicle from the rear driver's side door, walked towards the UC, and shook his hand.  The UC continued walking to the car and stopped at the driver's side window.  The UC greeted Diaz and Pierce, both of whom were wearing black shirts. In addition, despite the fact that the day was warm, Pierce was wearing dark – seemingly black – gloves.

After greeting the men, the UC asked them if they were "squared away" and if they spoke English.  In response, Diaz commented not to worry and that he had already informed Pierce to go "light" on the UC.  The UC advised that he should have "one or two keys of coke in a bag and the other fifteen keys of coke would be in the living room."  The UC stated that they had agreed to split the proceeds half and half.  Diaz again told the UC not to worry about it and shook the UC's hand. At this point, Mojica returned to the vehicle and sat in the rear bench seat, and Camby and Joel Colon walked over to the car. Referring to the UC, Joel Colon said, "[h]e says to make sure you don't shoot him" and Camby Colon then told Diaz and Pierce, "[i]f anything kill him…You heard? If anything kill him."  The UC asked Diaz, Pierce, and Mojica if they were

-21-

"square," to which no one provided a negative response.  The UC began to walk away from the car.

As the UC walked away, Diaz yelled for the UC to return. The UC complied and returned to the driver's side window.  The UC explained the manner in which the pick-up of cocaine typically occurred; that the UC enters the house and shuts the door behind him, is given his package of cocaine, and then opens the door and exits.  Diaz asked, "Yo, how many dudes usually be in the house?"  The UC stated that two individuals would be present, one of whom was short and overweight and would be armed with a firearm. Diaz responded, "So the fat guy is the one we have to worry about?"  The UC stated, "Yeah, exactly."  Diaz then stated, "okay, that's what I wanted to know."  The UC further stated, "So, when you guys, you guys are coming in as I'm in the house, so I'm going to the floor, brother."  Diaz replied, "Yeah, you go to the floor."  Pierce then stated, "Don't jump on the floor immediately."  The UC advised that he wanted to make sure that he was not harmed, but that he would "make it look good" to which Pierce said, "yeah."  Diaz then stated, "we might have to knock him out 'cause he got that gun on him." Diaz questioned the UC as to where the fifteen kilograms of cocaine would be located. The UC responded that he would have two kilograms in a bag and that the remainder would be in the living room. He also stated that the kilograms were stamped and that the stamp would need to be removed before the cocaine "hit the streets" to which Pierce responded, "yeah." The UC once again asked Diaz, Pierce and Mojica if they were "square" and Diaz responded, "You are alright." The UC walked in the direction of the vehicle containing Soto and Mendez and was joined by the Colon brothers.  In front of Soto, Mendez, and the Colon brothers, the UC asked in Spanish, "Are we square?" to which Joel Colon responded, "Yes."

-22-

Shortly thereafter, the defendants were arrested.  The following items were found in the BMW driven by Diaz: (1) a loaded .40 caliber pistol; (2) a black scarf; (3) black gloves; (4) a EO Tech sight; (5) a black and red Bulls hat; (6) a black and white Sox hat; (7) two rolls of duct tape; and (8) a plastic blue tarp. The following items were found in the car driven by Soto: (1) a loaded and cocked firearm in the center console; (2) a black and white bandana; (3) a black skull cap; (4) two State of Connecticut license plates with two different identifying numbers; (5) a black hooded sweatshirt; (6) a black scarf; and (7) a black baseball hat.

Agents also executed a federal search warrant at the auto body shop, where they located, several dozen rounds of ammunition, a small baggy of crack cocaine, two digital scales, a plastic container with narcotics residue, a box of baggies, and a baggie with the corner cut off.

### J.      Joel Colon's Statements

Following his arrest, Joel Colon was placed in a police car and surreptitiously recorded. Initially, he was placed in a car with his brother and the two men exchanged Percocet pills that Joel Colon had in the small side pocket of his pants.  In their exchange, Camby Colon stated that various participants in the robbery had firearms in their possession.   Subsequently, Joel Colon was moved into a car with Mendez and Mojica.  During that conversation, Mojica stated several times that he had told others that the robbery was too risky because the UC might be law enforcement.  In response, Joel Colon said, "it was 50/50 dude…you're acting like …it's not safe to do it, but you know."  Joel Colon then admitted that "[t]he one I use to deal with was the tall black dude", referring to CI-1.   Throughout the conversation, the men discussed the firearms located in various cars as well as who would have set them up for the sting operation.

-23-

K.      *Joel Colon's Affidavit and Testimony*

In support of his motion to dismiss the indictment, the defendant submitted an affidavit and testified at a hearing.  In both his affidavit and testimony, the defendant stated that he never proposed a robbery to CI-1 and had never dealt kilogram quantities of cocaine.  As detailed above, however, the evidence in this case showed that the defendant did deal in such quantities of cocaine and did suggest an armed robbery to CI-1.

## DISCUSSION

A.      *Sentencing Standards*

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed must be reached through consideration of the advisory Guidelines and all of the factors identified in 18 U.S.C. § 3553(a).  In so doing, the Court has a statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)).

The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. §3553 including, but not limited to "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner; ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense."  Accordingly, in determining an appropriate sentence for the defendant, the Court must take into account *all* of the factors delineated in Section 3553.

**B.**   ***Based on These Sentencing Factors, a 97-month Sentence is Appropriate and Just.***

Based on these factors, an incarceratory sentence of 97 months is warranted and appropriate.

Both the nature and circumstances of this case and the character of this defendant call for a significant sentence of incarceration.  Joel Colon is a drug dealer who recruited, organized and armed a small group of close associates to rob a stash house of 15 kilograms of cocaine.  This idea did not originate with the government.  In December 2013, the defendant asked one of his cocaine customers – a man to whom he regularly sold more than 100 grams of cocaine – if he knew anyone who could be robbed.  He explained that he had a friend with a gun who could perform the deed.  In an effort to protect the public, ATF presented a possible victim, but made that victim as hard to get as possible.  The robbery would have to occur during the day in a residential neighborhood.  The men inside the house were seasoned and armed members of a drug trafficking organization and would not part with the drugs voluntarily.  The drugs were stamped, indicating that they belonged to a larger drug trafficking organization.  ATF offered the defendant nothing in support of this plan: no weapons, no people, no cars, and no ideas on how to commit the crime.

Joel Colon accepted that offer without a second glance. Indeed, when CI-2 first asked about "stick up kids," the defendant was all too happy to sing the praises of his experienced and mature robbery crew. In that conversation, the defendant does virtually all of the talking as he pitches CI-2 on the capability of his team. The take away from that recording is clear: Joel Colon wanted the job. And at the time, he had no idea what or who he was robbing. He had no idea of the robbery's risks or rewards.

Upon learning the details of the robbery and its numerous and varied obstacles, he was undeterred. He solicited and organized the crew that was to enter the house. He and this crew collectively determined how many people were needed, the number of firearms needed, and the methods by which the robbery would be completed. He did not care that people could be shot or killed or incarcerated. Indeed, he repeatedly advocated for Omar to join the crew, knowing that Omar was out on bond pending sentencing. All he cared about was completing the robbery. Contrary to his sentencing argument, that is not a good man; it is a person who needs time in prison to reflect on how he got to such a callous point in his life and to learn how to avoid ever being there again.

Advocating for a departure or non-Guideline sentence, the defendant largely argues that (a) he is being punished too severely for participating in a limited manner in a theoretical crime invented by the ATF, (b) his prior criminal conduct was limited and far less than suggested by the evidence, and (c) he need not go to prison for a long period of time because is a nice man who has worked hard all of his life and greater sentence will not offer any deterrent value. These arguments do not warrant that which the defendant seeks.[2]

---

[2] It should be noted that the government has already taken these arguments into account in negotiating the defendant's plea. Specifically, the government is not seeking the top of the negotiated guideline range. In light of

As to the first argument, stripped to its essence, the defendant suggests that any crime thwarted before completion by law enforcement is not worthy of punishment.  This "no harm, no foul" after-the-fact justification ignores his criminal intent and his willingness at the time of the offense to commit a heinous crime.  Furthermore, to assume that stash house robberies exist only in ATF's imagination is a complete fallacy.  In fact, robberies of drug dealers and their stash houses are a common reality throughout the country, one from which Connecticut is not immune. *See, e.g.,* Exhibit A (attaching 28 articles from the last five years discussing 28 cases from throughout the country that involved the robbery of drug dealers or their stash houses); *United States v. Trumaine Hearst*, 3:13cr139(MPS)(defendant convicted of killing a marijuana dealer during the course a robbery); *United States v. Larry Corbett*, 3:10CR28(CFD), 750 F.3d 245, 247-50 (2d Cir. 2014)(defendant convicted of robbing and killing a marijuana dealer for his product); *United States v. Negus Thomas*, 3:02cr72(AWT)(defendant convicted after trial with the murder of a man in retaliation for crack cocaine robbery); *United States v. Willie Garvin*, 3:14cr249(AWT)(charging the defendants with two separate counts of Hobbs Act robberies of different drug dealers in New Haven in 2011 and 2013).

Moreover, the extent of this reality cannot be fully known or appreciated because these cases are under-reported as the victims are involved in criminal activity and are afraid that they will be charged if they seek police intervention.  As an example, in the instant case, according a cooperating witness, the Colons were robbed twice; in one instance – where nothing illegal was stolen – they reported the crime and in the other – where narcotics were stolen – they did not. Additionally, the victims may have their own means of seeking retribution through "street

---

this position, the government contends that the defendant has received the limited benefit that he should based on these factors.

justice" – using members of the drug trafficking organization to retaliate against the robbers. Indeed, often times, these cases are only reported to police when the victims are killed.

In light of these facts, the use of undercover sting operations is a legitimate law enforcement tool that can be – as it was in this case – successfully used to prevent actual armed robberies. Here, the Colon brothers were long-time drug dealers who were well-aware that drug dealers could make good victims for robberies.  Given the defendant's December 2013 overture to one of his customers, the ATF's follow-up to that offer was a necessary investigative step in order to protect the public.  Without that appropriate intervention, the defendant and his crew likely would have robbed someone else with significantly more devastating consequences.

Turning to the second argument, there is nothing "low-level" about the defendant's prior drug trafficking.  Contrary to his arguments, the defendant's cocaine sales were not limited to ounce street sales.  According to CI-1, Joel Colon regularly sold him 100 to 500 grams of cocaine.  This is consistent with Joel Colon's own statements and actions.  For example, on January 29, 2014, the defendant sent the following message to CI-1, which CI-1 sent to the FBI handler: "Yo is joel my nigga i got a half one call your boy."  According to CI-1, this meant that the defendant had several hundred grams of cocaine available for sale.  Similarly, during the first sale to CI-2, the defendant had 100 grams available for sale.  On April 3, 2014, Mr. Colon told CI-2 that "I got my people right now… I just call them, I need one, two, three bricks … we not playin' around."  A "brick" is a common name for a kilogram of cocaine as they are often packaged in the shape of a brick.  Similarly, on April 11, 2014, while waiting to travel to the take-down site, the defendant explained to CI-2 the pricing and general methods of shipment of cocaine from Puerto Rico and the Dominican Republic. The defendant further explained that in

-28-

2013, he and his organization got "more than a hundred over here.  We used to grab like eight, five to eight every week."  He then directed CI-2 to ask CI-1 about it. Agents understood this to mean that the organization had received more than one hundred kilograms of cocaine in the previous year.  These are not the words or actions of a "low-level" drug dealer.

Nor do these statements and the defendant's numerous prevarications about his drug dealing support his argument that he is a good, hard-working man who puts the well-being of his loved ones before all else.  In fact, the evidence shows the defendant to be a drug-dealing, dangerous street hustler who is out to profit whatever the costs.  Moreover, even after being caught, the defendant was willing to bold-face lie under oath to this Court.  Such behavior evidences his complete lack of respect for the law.

As for deterrence, not even his arrest deterred him from committing the further crime of perjury and obstruction of justice.  Thus, contrary to the article submitted by the defendant, the certainty of the punishment was not enough to stop his non-compliance with the law.  With respect to that article, it dealt largely with general – as opposed to specific – deterrence.  For the government, the main purpose of the requested sentence is to deter this specific defendant from engaging in crime in the future.  To the extent that the submitted article addressed that issue, it appeared to do so in the context of lower-level, non-violent crimes. (*See* Docket No. 261, Exhibit E at 6 (evaluating the recidivism rates of those who spent 30 months in prison versus those who spent 12.9 months in prison) & 7 ("Researchers also find an increased likelihood that lower-risk offenders will more negatively affected by incarceration.").  Lastly, regardless of the deterrent effect, the need to punish this defendant for his conduct and to protect the public from him warrants the requested sentence.

-29-

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a Guideline sentence of 97 months in prison, followed by five years of supervised release is appropriate and should be imposed in this case.

Dated: August 25, 2015
        Bridgeport, CT                    Respectfully submitted,

                                              DEIRDRE M. DALY
                                              UNITED STATES ATTORNEY

                                              By: **/s/**
                                              VANESSA RICHARDS
                                            ASSISTANT UNITED STATES ATTORNEY
                                            Bar Number: PHV 05095
                                            UNITED STATES ATTORNEY'S OFFICE
                                            1000 LAFAYETTE BOULEVARD
                                            BRIDGEPORT, CT 06604

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2015, a copy of the above submission was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

**/s/**
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
PHV 05095
(203) 696-3000